PALISADE WEST ASSOCIATES, PLAINTIFF, v. MARTIN ARANOW AND SYLVIA ARANOW, DEFENDANTS.

Bergen County District Court

Decided May 26, 1972.

*Mr. Jay G. Marshall*, Attorney for Plaintiff.

*Mr. Martin Aranow, pro se.*

HUOT, J. D. C.   This is a landlord-tenant action wherein plaintiff seeks possession on the grounds of nonpayment of rent.   Defendants concede that the rent reserved under a lease dated March 1, 1972 was not paid for the months of April and May 1972.   However, defendants did tender for the months in question the amount of the rent reserved in their prior lease which expired March 31, 1972.   The prior rent was $430 a month.   The new rent is $476 a month.   Additional parking charges are not involved in this contest.

The tenants raise the following defenses:

1. The landlord failed to comply with the notice requirements of section 301.501 *et seq.* of the rules and regulations

of the Cost of Living Council. 6 *CFR* § 301.501 (12/30/71).

2. The rental increase charged by the landlord is in excess of that permitted by said rules and regulations.

3. They should be allowed a set-off against the rent for interest due them, which accrued on their security deposit under the expired lease.

The landlord admits that the notice to the tenants does not strictly comply with section 301.501 *et seq.,* but argues that the section was complied with in substance if not in form. It also contends that it strictly followed the formula prescribed to arrive at the new rental of $476 a month. In regard to the third defense, the landlord contends that a tenant is not entitled to set-off interest due on money deposited as security in an interest-bearing account, as required by *L.* 1971, *c.* 223.

The notice given by the landlord and admittedly received by the tenants was dated January 26, 1972 and reads as follows:

OFFICE OF THE UNDERSIGNED
       Suite 1002

147 West 42nd Street
New York, N. Y. 10036

Phone (212) 524-0563
Dated: January 26, 1972

Mr. (s) Martin Aranow   Apt. 6-L
2185 Lemoine Avenue
Fort Lee, N. J. 07024
Dear Mr. Aranow:

As of the 29th of December, 1971, a statement was issued by the Price Commission outlining the procedures and regulations which are to govern rent increases during the President's Freeze.

Please, therefore, consider this as notification that as of April 1, 1972 , your new rental will be $476.00 , and is within the allowed percentage of 8% plus 2.5% permitted within your building.

Old Rent: $430.00
Increase: 46.00
New Rent: $476.00

The apartments for which renewals were written during the base rent period and upon which the computations for Bridge Plaza Towers were determined, are as follows:

4–H, 3–J, 8–J, 4–K, 4–L, 7N

All apartments which rent for $500.00 or more have been exempted from the above controls. For your further information, we have attached a copy of statement issued by the Price Commission.

Very truly yours,
FORT BRIDGE COMPANY
A. Stern

AS/ag
Encl.

Attached to said notice was a photostated article entitled "Price Panel's Statement on Rules on Rent," and contains the sub-legend "Special to The New York Times." It purports to be from Washington on December 30. At the beginning of this article this introduction appears: "Following is the text of the supplemental guidance on rent regulations issued today by the Price Commission." There then follows a press release explaining the action of the Price Commission, a copy of which is annexed hereto.

Section 301.502, "Notification", provides in pertinent part:

In the case of a proposed rent increase to which the present lessee of the residence or other real property would be subject—

(a) *Requirement of 30-days' notice.*
The lessor must notify the lessee of the proposed rent increase at least 30 days before the date it is to become effective;

(b) *Contents of notice.* The notice shall be in writing and shall set forth —

(1) The amount of the monthly rent before and after the proposed increase;

(2) The percentage increase and dollar amount of the proposed increase;

(3) The effective date of the proposed increase;

(4) The amount of the proposed increase which is attributable to capital improvements, State and local real estate taxes, and State and local fees, levies and charges for municipal services, and any increase allowable under § 301.102 (a) (1) ;

(5) The base rent and an explanation of the manner in which the base rent was determined, including identification of units involved and dates and amounts of transactions where applicable;

(6) The method of computation of the proposed increase; and

(7) The following statements:

(A) You have the right to examine the documentation which supports this proposed rent increase in order to satisfy yourself that

the proposed rent increase is in accordance with the rent regulations prescribed by the Price Commission. This documentation is located at _____ : and may be inspected upon request between the hours of _____ through _____ on _____ (specify days of week).

(B) If you do not understand the basis for this increase or believe that the increase is not allowable under the rent regulations of the Price Commission, advise us and we will arrange a suitable meeting time with you at a location convenient to your residence to discuss the proposed increase and explain its justification.

. (C) It is hereby declared under the penalties of perjury that the foregoing statements and facts are true to the best of my (our) knowledge and belief; and that the increase in your rent is not in violation of the Economic Stabilization Regulations.

■ The first question presented to the court is whether the letter of January 26, 1972 and the photostatic attachment comply with the requirements of section 301.502. This court has authority to entertain the defense of noncompliance with Price Commission regulations. *Brookchester Inc. v. Matthews,* 118 *N. J. Super.* 565 (Cty. D. Ct. 1972).

Subsection (a) and subdivisions (1), (2) and (3) of subdivision (b) were complied with by the notice. The notice was given January 26, 1972, which is more than 30 days before the increase would become effective. It was in writing. It set forth the amount of the rent before and after the proposed increase. It set forth that the increase was a total of 10.5% (8% allowed percentage and 2.5% permitted within that building) and the dollar amount of the increase.

However, the notice did not set forth the information required by subsection (b) (4). Nor did it set forth the base rent nor the manner in which the base rent was determined; nor the dates and amounts of transactions involved in the determination as required by subsection (b)(5), although it did identify certain units used in such determination (only one of which appears to be proper for such use).

Further, the notice did not set forth the method of computation specified by subsection (b)(6), nor did it contain the statement which subsection (b)(7) requires.

■ There is no doubt that the information made obligatory by subsections (b) (4), (5), (6) and (7) of 301.502 was not contained in the notice. The landlord, however, contends that the photostat attached to the notice gives sufficient information to be considered substantial compliance with the regulation, and that subsection (b)(4) is satisfied by the notice stating that the new rent "is within the allowed percentage of 8%, plus 2.5% permitted within your building."

The 2.5% is allowed by section 301.102. The failure to indicate any increase attributable to "capital improvements, State and local real estate taxes" and the like may be fairly read as negativing any portion of the increase for those items. In this case no claim is made for such increase and, therefore, the failure to include such information in the notice cannot be violative of the regulation.

The determination of compliance with subsection (b) (5), (6) and (7), however, presents a different situation. The photostat attached to the notice explains how to compute an increase in rent, but neither it, nor the notice, tells the tenants that the landlord used such method or what numbers were used in the formula. The photostat sets forth the tenants' right to question the increase and to see the landlord's documentation. However, it does not set forth the location of those documents, the times when they are available for inspection, or the opportunity to have a meeting with the landlord. Neither the notice nor the photostat contain a declaration "under the penalty of perjury" as to the truth of the statements in the notice.

Subsequent to the receipt of the notice the tenants wrote the landlord by letter dated February 2, 1972 expressing a belief that the landlord may be in error and requesting to see the rental record books. By letter dated February 7, 1972 the landlord advised the tenants of the availability of the rental books and its willingness to permit inspection by them. Thereafter, by letter dated March 1, 1972 the landlord advised the tenants as follows:

OFFICE OF THE UNDERSIGNED
        Suite 1002

                                        147 West 42nd Street
                                        New York, N. Y. 10036

                                        Phone (212) 524-0563

                                March 1, 1972

Mr. Martin Aranow    Apt. 6-L
2185 Lemoine Avenue
Fort Lee, N. J. 07024
Daer Mr. Aranow:

    We did make an attempt to determine which leases were *signed* during the base period and found that the leases which would be eliminated because they may have been signed earlier, would, in all fairness, have to be replaced by others which, although signed during the base period, have a later renewal date.

    This would mean going through all the files and the formula determined from such a search would still be an arbitrary one, since the signing dates are not always available. As you can see, it is an impossible situation.

    In all probability the percentage rate would not be much different from what we have determined, since increases were made at about the same rate right along.

    As you can understand, we are quite anxious to comply with Federal regulations and though the latest rulings are quite complicated and apparently open to interpretation, we feel that our "formula" is an equitable one.

                            Very truly yours,
                            PALISADES WEST ASSOCIATES
                            A. Gellis

AG/s
Enc.
P.S.    We are enclosing the lease you requested. Please sign and return with your check to cover additional security, $66.00.

These subsequent communications, the landlord contends, should be considered as supplemental compliance with the notice requirement and a cure to whatever defects may have existed in the original notice. Certainly, all communications were 30 days before the effective date of the rent increase. However, these supplemental advices were the result of the letter of defendants dated February 2, 1972. The court takes judicial notice that the defendant Martin Aranow is president of the New Jersey Tenant Organization and recognizes the validity of his claim, as expressed in the letter of February 2,

1972, that he has "more than an average knowledge of the guidelines." Defendants' position and personal knowledge cannot be a determining factor in the interpretation of the rules and regulations, for the law must apply equally to all tenants. What the law requires of a landlord and a tenant must be the criteria, not the personal knowledge of each individual. If a tenant's familiarity with the requirements were to excuse a landlord from compliance with the regulations, then the landlord's lack of such knowledge should also excuse him from compliance. Obviously, this may not be.

The notice of January 26, 1972, with the attached photostat, fails to strictly comply with the requirements of section 301.502. Is this failure fatal to a rent increase?

Section 301.501 provides:

> No person may increase a rent, with respect to any transaction after December 28, 1971, involving a lease or implied contract of occupancy of a residence or other real property, unless he has complied with this subpart, *regardless of whether the increase is otherwise allowable under this part.* [Emphasis added]

The sub-part referred to pertains to the procedures for rental increases of which section 301.502 is a part. The underlined words express the policy of the Price Commission and is reaffirmed in section 301.102:

> (a) *General.* When a residence or other real property becomes occupied after December 28, 1971, a person may charge, offer to charge, or give notice of intent to charge, a monthly rent in excess of the base rent, *after notification pursuant to* § 301.501, only to the extent that the monthly rent does not exceed the sum of the base rent, plus * * * [Emphasis added]

The words are clear. There is no ambiguity or need for interpretation. The notice must be given, must contain each element set forth in section 301.502 and must contain the statement in the words required by section 301.502 (b)(7)(A), (B), (C).

This determination makes it unnecessary to consider the other defenses.

■ The notice given to the tenants herein did not comply with the regulations. The rent increase is invalid. The complaint seeking possession is dismissed without prejudice to the rights of the landlord to seek further compliance with the rules and regulations pertaining to rent increases.

The tenants have deposited the sum of $952 with the clerk of the court pending this determination. The clerk will forward $860 to the tenants' landlord as the rent due for April and May 1972, and return $92 to them.

# Price Panel's Statement on Rules on Rent

Special to The New York Times
WASHINGTON, Dec. 30—
Following is the text of the supplemental guidance on rent regulations issued today by the Price Commission:

## A. Introduction

The Price Commission's rent regulations are designed to reduce the average rate of rent increases while allowing the landlord to maintain a reasonable rate of profit. The regulations provide for the determination of base rentals. To this base rental, the landlord may add a 2.5 per cent annual rent increment to cover operating costs, such as labor, electricity, gas, fuel, interest, etc. Increases in state or local property taxes, government fees and levies and increases in charges for municipal services (exclusive of gas and electricity) may also be added to the base rent plus 2.5 per cent increment.

## B. Base Rent

### 1) Leases of One Month or Less

The basic rent for a unit on a month-to-month (or less) lease is the rent permitted for that particular unit during the freeze period beginning Aug. 15 and ending Nov. 13, 1971. If the rents for such units have been increased above the freeze period in accordance with previous regulations, they must now be adjusted downward.

For example, if a tenant on a month-to-month lease paid $100/month rental during the base period and is now paying $110/month, his base rent is $100/month, and his current rent (as of Dec. 29, 1971) will be rolled back to that level. The landlord is not required to reimburse the tenant for payments made at the higher rate up to Dec. 29. With 30 days' notice, the landlord may increase the base rent to the level permitted by the rent adjustments of 2.5 per cent plus cost pass-through.

### 2) Leases of More Than One Month

The base rent for a unit with a lease of more than one month, is the average rent (figured on a percentage increase basis) charged for units in the same building or complex-in-transactions executed between July 16, 1971, and Aug. 15, 1971. If there were no transactions in this period, the nearest 30-day period in which there was a transaction will be used up to within 90 days preceding Aug. 15, 1971. The base rent of units for which leases were signed during the 90 days prior to Aug. 15, 1971, is the rent specified in that lease.

For example, a tenant under such a lease now pays $100/month rental for his apartment and his lease expires on Jan. 1. During the period from July 16, 1971, and Aug. 15, 1971, there were two lease transactions in his building. The rent of one apartment was increased from $100 to $110 and the rent of a second apartment was increased from $200 to $220. The landlord calculates the average percentage increase by adding the rentals paid for each unit after the rent increase and dividing their sum by the sum of total rent paid for each unit before the increase.

$$\frac{110}{100} + \frac{220}{200} = \frac{330}{300} = 1.10$$

The base rent for the tenant whose lease expires on Jan. 1 is calculated by multiplying his present rental by 1.10. His base rent then becomes $110.

If there were no transactions during the 90-day period preceding the base rent is a 5 per cent increase over the rental prevailing for the unit as of May 25, 1970, or the rent specified in his current lease, whichever is greater.

If leases have been signed since the freeze which comply with the "highest transaction" rule but not with the new definition, these leases may remain in effect.

## C. Rent Adjustment

The following may be added to all base rentals of leases or terms of rental agreement permit increases:

1. An annual rent increment of 2.5 per cent. This increment is automatic and may be added even if there is not an identifiable increase in operating costs.

2. Increases in state or local property taxes, increases in government fees and levies, and charges for municipal services (exclusive of gas and electricity). These charges may be added onto the base rent (dollar per dollar) in addition to the 2.5 per cent increment increase. Pass-through of these costs must be made, after the 2.5 per cent increment, by allocation to such costs in individual units based on the relationship of a unit's rent to the sum of the rents of all units to which the cost applies.

3. An increase for capital improvements made after Aug. 15, 1971. The amount of the increase in monthly rent for a unit may not exceed 1.5 per cent of the cost of the capital improvement applicable to the rental unit. If this amount is less than $1 per month, the landlord may not add it to the base rent unless the substantial capital improvement directly benefits all residences in a building or complex as a whole, for example, the addition of an air-conditioning system. However, a rent increase for a capital improvement may not exceed 10 per cent of the monthly rental without I.R.S. approval.

Example: The base rent for Unit A is $100 and the lease expires on Jan. 1, 1972. Property taxes on the unit have increased by $2/month. In addition, the landlord paneled the unit at a cost of $500. What rent may he charge on Jan. 1, 1972?

He may add the 2.5 per cent increment ($2.50), the $2 tax increase and 1.5 per cent of the $500 substantial capital improvement ($7.50) to the base rent of $100.

$100
2.50 (Increment)
2.00 (Taxes)
7.50 (Capital improvement)

$112.00

Thus, he may increase the monthly rental to $112.00.

## D. Notification of Rent Increases

Tenants must receive written notice at least 30 days before a rent increase goes into effect. The burden of proof for proper notification is on the landlord, who may obtain proof in either of two ways: 1. Send notices by regular mail and sign a notarized affidavit that a specific number of notices were sent to specified tenants at specified addresses on specified dates, or, 2. hand-delivered notices may be served, and receipts obtained from tenants or their agents.

The notifications must contain the citation of the regulation under which the increase is allowed, accompanied by an explanation in layman's language. Further explanation of the regulation's application to the tenant's increase should contain: the rent before the increase; the rent after the increase; the percentage of the increase; amount of the increase; the date the in-

crease is effective; the example of the computation of the increase; other information necessary for checking the computation of the increase such as base rent of the units involved in the computation, and the dates and amounts of transactions, taxes and municipal charges and how they are prorated, and full descriptions of capital improvement charges and how they are prorated.

The tenant may question an increase and has the right to see the landlord's documentation supporting the rent increase.

## E. Rental Units Exempt From Price Commission Regulations

The following types of rental units are exempt from these pricing regulations:

1. Industrial, farm and non-residential commercial property.

2. Rental units on which construction is completed and a certificate of occupancy or other similar document is issued for the first time after Aug. 15, 1971.

3. Rehabilitated dwellings for which the cost of rehabilitation exceeds one-third of the total value of the rehabilitated property (including the cost of rehabilitation) and for which a certificate of occupancy or similar document is issued for the newly rehabilitated dwelling for the first time after Aug. 15, 1971.

## F. Violation

If a tenant does not understand the basis for a rent increase, he should meet with the landlord to discuss the justification for the increase. If the landlord refuses to meet with him or if, after meeting with the landlord, he believes that the increase is in violation of the regulations, the tenant should provide the Internal Revenue Service with a copy of the notification of the proposed rent increase and a detailed statement in writing as to why he believes there has been a violation.

## G. Exceptions

Requests for exception from rent regulations shall be considered by the Price Commission only in cases of extreme hardship under criteria to be specified by the commission. A lessor seeking an exception shall, at the time the exception is requested, notify his tenants on a unit-by-unit basis as to the dollar and percentage amount of any adjustment or increase being sought.